LEDA PROULX, administratrix, *vs.* J. W. BISHOP COMPANY.

Middlesex.  November 10, 1909. — January 6, 1910.

Present: KNOWLTON, C. J., MORTON, BRALEY, SHELDON, & RUGG, JJ.

*Negligence,* Employer's liability, In tearing down building.

A common laborer employed by a contractor to assist in tearing down a building, when he is obeying an order of a superintendent in charge of the work to throw out of a certain window floor boards which have been torn up, and in doing this necessarily passes over a portion of the floor which by direction of the superintendent has been sawn through but still is held in place and has the appearance of being intact, has a right to assume that the floor over which it is necessary for him to pass in obeying the order of the superintendent is reasonably safe, and if the severed portion of the floor gives way as he is passing over it and he falls through and suffers injuries which result in his death, in an action against his employer for causing his death, it is a question of fact for the jury whether the deceased workman's general knowledge of the character of the operations going on about him in the tearing down of the building should have led him to anticipate that the superintendent would direct him to perform work requiring him to pass over a severed portion of the floor, which had been put in this unsafe condition by the superintendent's direction, without giving him some warning of the danger to which he must be exposed.

It is evidence of negligence on the part of the superintendent of a contractor in charge of the work of tearing down a building toward a common laborer employed in the work, that such superintendent, after having caused a portion of the floor of the building to be sawn through, so that to walk over it would be dangerous especially if carrying a load, ordered the laborer to remove some loose boards and throw them out of a certain window, knowing that the laborer in obeying his command would be obliged to pass over the weakened portion of the floor, and that he gave the laborer no warning of the danger, which was not obvious from the appearance of the surface of the floor.

TORT by the administratrix of the estate of Celestin Proulx, the plaintiff being also his widow, for the conscious suffering and death of the plaintiff's intestate, caused by an injury sustained by him on March 2, 1908, while in the defendant's employ, from the giving way under him of a section of the flooring of the second story of a building in Lowell where he then was at work, and his consequent fall of about eighteen feet, from the effects of which he died on March 16, 1908; with three counts, the first alleging negligence of the defendant in failing to give the plaintiff's intestate sufficient warning and instructions regarding the dangers attending his work, the second alleging negligence of a superintendent, and the third alleging negligence of a superintendent in permitting the planking of the floor on which the plaintiff's intestate was working to be sawn through and thus weakened while the intestate properly was making use of it in his work.    Writ dated June 25, 1908.

In the Superior Court the case was tried before *White*, J.  The defendant admitted that due notice of the time, place and cause of the injury had been given by the plaintiff.  It also admitted that one Ellis was a person in the service of the defendant entrusted with and exercising superintendence over the deceased and over the work under way at the time of the accident.  The defendant was engaged in tearing down a mill building in Lowell, and the plaintiff's intestate was a general laborer who had been in the defendant's employ for about two weeks and had been working on this same floor for about five days before the accident.

The building originally had been about three hundred feet long and sixty-five or seventy feet wide, of two stories with a pitched roof, extending in a nearly northerly and southerly direction, and the work of demolition had begun at its southerly end

and was progressing northerly. The southerly end wall and the roof for about two thirds of its original extent therefrom had been removed wholly, the side walls for about the same distance had been demolished partially and about two thirds of the flooring on the second story had been removed with the floor beams supporting it; so that, just before the accident, the northerly end wall, the roof for about one third of its original extent therefrom, the second floor under it and the side walls from the northerly end down as far as the standing roof and second floor extended remained for that distance intact and practically undisturbed, while from thereon southerly the side walls were as stated above partially removed, standing at varying heights sloping down from the standing floor toward where the southerly end had stood originally.

The second story flooring, a section of which gave way under the deceased, as originally constructed and as it stood over the northerly one third of the building just before the accident, was composed of one thickness of three inch planking, each plank being eighteen feet in length laid upon floor timbers extending across the building about nine feet apart, so that each of these eighteen foot planks would rest upon three of the floor timbers, spiked to one at each end thereof and also to another under its centre.

For some few days before the accident a gang of men, the plaintiff's intestate being one, had been engaged upon this second floor in cleaning brick, which was some of the material of the building. A derrick standing outside the building was employed in raising loose brick and depositing them from its bucket in an irregular pile some few feet northerly from the open edge of this floor. These men, some eight or ten in number, among whom was the plaintiff's intestate, as they were so employed were seated upon the northerly side of this pile and as they cleaned bricks from this pile they threw the cleaned bricks behind them, thus making two piles on this floor, the one the more southerly in its situation and nearer to the open edge of the flooring being composed of uncleaned brick deposited from the derrick bucket and the other just northerly of it being composed of cleaned brick.

Up to the time of the accident the flooring, from the northerly

end wall of the building down to and under both of these piles of brick and for some eighteen or twenty feet beyond the most southerly one, was intact and practically undisturbed, except that it appeared that one or two of the sections near the easterly side wall and one or two of the sections nearer the centre had been removed in so far as the top flooring and the planking itself went, but leaving the cross timbers standing. All the flooring which had been torn up and removed before the day of the accident had been removed by ripping it up, and none had been removed by means of sawing through any part of it.

On the morning of the accident the gang of eight or ten men including the plaintiff's intestate had been sitting down on the northerly side of the pile of uncleaned brick engaged in cleaning bricks from it and throwing the cleaned ones behind them as they worked. While these brick cleaners were so engaged, Ellis directed two other men to rip up the top flooring of seven-eighth inch boards just south of this pile of uncleaned brick, and two men thereupon went to work doing this, proceeding from a point near the centre of the flooring on this southerly section thereof toward the westerly side wall, one using a pick and the other a crowbar, and throwing the top boards behind them as they ripped them up. About the same time that he set these two men at this work, Ellis directed a third man, a carpenter, to saw through the planking behind the men removing this top flooring, directing him where to saw it, and the carpenter thereupon began to saw through the planking from a point near the centre of the room straight across toward the westerly side wall in a direction parallel to and just southerly from the pile of uncleaned brick, upon the opposite side of which the gang of men, including the deceased, were at work cleaning.

After these three men had been so engaged for some time, two of them ripping up the top floor boards and the other sawing across the planking thereby exposed, all of them working in the same direction westerly from the centre of the room toward the side wall, Ellis ordered the deceased and two or three others of the men then working cleaning brick, to quit that work and to gather up the loosened top floor boards from the other side of the

brick pile, and to throw them out of a window down into the yard beneath, indicating at the same time the window they were to throw them from, which was a window in the east side wall of the building north of the place where the carpenter was sawing through the floor and north also of the pile of uncleaned brick.

There was some conflict in the testimony as to just how long before the plaintiff's intestate was ordered to gather up the loosened floor boards the two men engaged in loosening them and the carpenter engaged in sawing through the exposed planking had been at work, some witnesses placing it at about half an hour and some at about an hour.

The result of the arrangement for breaking joints of this three inch plank flooring was such that, as the carpenter sawed across this plank flooring as he did just south of the floor timber nearest to the southerly edge of the pile of uncleaned brick, those planks which ended at that particular floor timber still would be fastened to the next two timbers south, but those planks which extended from the floor timber next south of the one near the southerly side of which the carpenter was sawing would be left spiked only at their southerly end and sawed through just south of their middle spiking, and so held in place only by the dowelling and the spiking at one end.

The plaintiff's intestate, with the three others called from brick cleaning by Ellis, began gathering up armfuls of the ripped up top flooring and carrying them across the floor diagonally from the southwesterly to the northeasterly ends and throwing them from the window indicated. They had made four or five trips to the window, taking the same course each time, the carpenter still being engaged all the time in sawing through the plank flooring, and were returning for another load, the plaintiff's intestate slightly in advance of the others, when one section of the plank flooring (four planks), which had been sawed through by the carpenter, gave way beneath the intestate and he fell through.

Ellis himself was not upon this floor at the time the plaintiff's intestate fell, but he had been there when the intestate began carrying the loose floor boards, so that he could observe the course taken in carrying them. There was evidence from which

the jury might have found that there was no course for the men to take, in passing from where these loose boards lay to the window through which they were directed to throw them, without either walking over planks which had been sawed through or climbing over the pile of uncleaned brick.  There also was evidence that there was no perceptible sagging in this planking after it had been sawed through, or anything visible upon the floor to indicate which planks were left, after the sawing, bearing upon two cross timbers and which planks were so left bearing upon but one.

At the close of the evidence the defendant asked the judge to rule specifically on each of the three counts in the plaintiff's declaration and also to rule upon the whole case that the plaintiff was not entitled to recover.

The judge granted the defendant's request as to the first count, but submitted the case to the jury on the second and third counts, and to the judge's refusal to rule that the plaintiff was not entitled to recover the defendant excepted.  The jury returned a verdict for the plaintiff in the amounts named below in the terms of the reservation ; and, at the request of the defendant, and by consent of the plaintiff, the judge reported the case for determination by this court, upon the terms, agreed to by the parties, that, if the ruling of the judge in submitting the case to the jury was correct, judgment was to be entered for the plaintiff in the sum of $3,500, apportioned $500 for the plaintiff as administratrix and $3,000 for the plaintiff in her individual capacity as widow; and that, if the ruling submitting the case to the jury was incorrect, judgment was to be entered for the defendant.

*N. D. Pratt,* (*J. H. Guillet* with him,) for the plaintiff.

*J. G. Walsh,* for the defendant.

BRALEY, J.   The defendant concedes that, irrespective of any question of pleading, the plaintiff is entitled to judgment on the verdict, if there was any evidence of its liability which warranted the submission of the case to the jury.  It was undisputed, that the plaintiff's intestate was a common laborer, and there is nothing in the evidence from which an inference as matter of law could have been drawn, that from experience or observation he was sufficiently acquainted with the indications shown by the

saw scarf in the planking, with the accompanying sawdust, to realize that the floor had been sawn asunder. *Reardon* v. *Byrne*, 195 Mass. 146. *Young* v. *Snell*, 200 Mass. 242. Besides, there was evidence that during the work of demolition the planking became littered with accumulated dust from the mortar and bricks which obscured the cutting made by the saw.

If the nature of the work in which with his fellow workmen he was engaged involved an acceptance of the obvious risks attendant upon the tearing down of the building, he undoubtedly had the right to assume, when the foreman entrusted with superintendence ordered him to stop cleaning bricks and to remove the detached floor boards, that the floor over which the jury could find he must pass while obeying the order was reasonably safe. *Feeney* v. *York Manuf. Co.* 189 Mass. 336, 340. *Young* v. *Snell*, 200 Mass. 242.

The defendant, relying on *McCann* v. *Kennedy*, 167 Mass. 23, urges that the risk, if not found to have been obvious, was merely momentary, and that it would be putting too onerous a burden on employers to require them to warn their employees of such transitory dangers. But the plaintiff in that case knew generally of the peril to which he might be exposed if he stepped upon the joist, although he did not know of the precise time when the danger might arise. The risk, therefore, was obvious, even if injury therefrom might be postponed, or never occur. The case of *Boisvert* v. *Ward*, 199 Mass. 594, where the plaintiff, an experienced carpenter, while doing the work in his own way was injured by the fall of a rotten rafter from the roof of a building which was being demolished, is accordingly not decisive of the case at bar. And for similar reasons, the cases of *Beique* v. *Hosmer*, 169 Mass. 541, and *Johnson* v. *H. P. Cummings Construction Co.* 201 Mass. 477, are plainly distinguishable.

If the deceased knew generally of the character of the operations going on about him, he might properly place some reliance on the oversight of the superintendent. It was a question of fact whether this knowledge should have led him to anticipate that the superintendent deliberately would direct him to perform work which would require passing over a severed floor, the unsafe condition of which had been created by the superintendent's

direction, without giving him some warning of the danger to which he must be exposed. *Reardon* v. *Byrne,* 195 Mass. 146, 149, and cases cited.

But if the questions of the plaintiff's due care and assumption of risk were rightly submitted to the jury, the defendant contends there was no evidence of the negligence of the superintendent. The cutting of the planking on the southerly side of the floor, as we have said, was done under his supervision. It does not seem to have been controverted, that after the floor was sawn through it became so weakened that to walk over it, especially if the workman carried a load, would be dangerous. The superintendent, however, ordered the removal of the loose boards lying on the southwesterly side, when he must have known that in obedience to the command the decedent would be required to pass diagonally over the floor as the only feasible way to reach the boards which were to be carried to the northeasterly side and thrown through an open window to the ground. It also appears that he was present after the decedent and other workmen had begun the removal, but gave them no warning of the danger. If these conditions were found to exist, there was evidence for the jury of the negligence of the superintendent, for which the defendant would be liable. *Feeney* v. *York Manuf. Co.* 189 Mass. 336. *Brosnan* v. *New York, New Haven, & Hartford Railroad,* 200 Mass. 221. The defendant's request for a ruling, that upon all the evidence the plaintiff was not entitled to recover was properly denied.

By the terms of the report, judgment in favor of the plaintiff is to be entered for the amount of the verdict, to be apportioned according to the stipulation of the parties.

*So ordered.*